Dunlap, P. J.
This is a suit for specific performance of a land contract, and is here heard upon appeal.
The evidence discloses that on January 29, 1917, The Factory Site Company, the defendant, and The West Side Sand & Supply Company, both corporations, entered into a written contract for the *149 sale of certain real estate by the first-named corporation to the second-named corporation, its successors and assigns. The contract provided that the purchase price should be $10,000 payable as follows:
“One Thousand Dollars cash in hand paid, the receipt whereof is hereby acknowledged; Two Thousand Dollars on or before thirty days from the date hereof; Two Thousand Dollars on or before eight months from the date hereof. When the aggregate amount of Five Thousand Dollars shall have been paid then the party of the first part shall execute its deed to the party of the second part, and contemporaneously therewith the party of the second part shall give its four promissory notes in equal amounts evidencing the remaining Five Thousand Dollars payable respectively in one, two, three and four years from the date of this contract, all bearing interest.at the rate of six per cent, per annum payable semi-annually; and secured by a purchase money mortgage on the aforesaid premises.”
The contract contained the following provision:
“If any one of said installments, or the interest accrued thereon, shall not be paid when due, then all of said installments remaining unpaid shall at once become due and payable, at the option of the party of the first part.”
Also the following:
“In case default shall be made by the party of the second part, its successors and assigns, in any of the conditions above stipulated to be performed by it or them, it shall and will be lawful for the party of the first part, if it so elect, to treat this *150 contract as thenceforth void, and to re-enter upon said premises at any time after such default without serving on the party of the second part, or any person holding under it, a notice to quit said land; and in case this contract shall be so treated as thenceforth void, the party of the second part, or those claiming under it, shall thenceforth be deemed a mere tenant at will under said party of the first part, and be liable to be proceeded against without notice to quit, under the provisions of the law regulating proceedings in cases of forcible detainer; and the party of the first part, in such case, shall be at liberty to sell the land and premises to any person whatsoever without being liable in law or in equity to the party of the second part or any person claiming under it for any damages in consequence of such sale or to return any payments made on account of or under this contract, and the payments that shall have been made may be retained by the party of the first part as stipulated damages for the non-performance of this contract on the part of the party of the second part.”
The evidence further discloses that The West 'Side Sand & Supply Company, in its attempt to carry out the provisions of this contract, made the following payments:
January 23, 1917, six days before the signing of the contract, $500, and on January 29, 1917, when the contract was signed, $500, so that the initial payment was fully made; then upon August 18, 1917, the payment of $2,000, which should have been made on March 1 (or thirty days after January 29), was made. Nothing further in the way of actüal payment to The Factory Site Company *151 was made. The evidence, however, discloses that The Factory Site Company is composed of three very eminent members of the Cleveland Bar, Mr. 'Dempsey, Mr. Squire and Judge Sanders; that the business of this company is transacted almost entirely by its president, Mr. Dempsey; and that on or about September 11, 1918, Mr. Dempsey, upon the solicitation of the Sand & Supply Company, consented to use his influence or the influence of his firm with the New York Central Railroad Company in the securing of a contract from said railroad company for the putting in of a switch, and accepted from the Sand & Supply Company a deposit of $1,000 which it was thought advisable to' pay to the railroad company in advance upon said contract. The purpose of offering this evidence in the case was to show that at any rate up to that time the Sand & Supply Company was at least “persona grata” to Mr. Dempsey and that he had no sincere intention of declaring the contract forfeited, but that, on the contrary, and in spite of some rather terrifying notices of which he had been the author, and which had been fruitful in forcing the payment of $2,000 just a short time before, yet long after it was due, he had at heart the best interests of the “young fellows” who composed that company. It also had a tendency to show his knowledge of the improvements which the Sand & Supply Company was putting into the premises, which amounted at that time to about $2,000; and it is to be here stated that the railroad company, no doubt influenced by Mr. Dempsey’s persuasive words, after some delay entered into a contract with the Sand & Supply Company in the *152 early part of 1918" and the Sand & Supply Company assumed the carrying out on its part of said contract, involving itself in a liability of several thousand dollars by reason thereof, and did the necessary grading, all at an expense of $500, in the spring of 1918, long after the date fixed for the payment of the $2,000 which by the terms of the contract was to become due in eight months after the making thereof, and the nonpayment of which now furnishes the sole basis for any claimed forfeiture which exists in this case.
It is most evident that up to the time of this payment Mr. Dempsey or his company had neither exercised the option which by the contract belonged to them, to make “all of the instalments remaining unpaid * * * become due and payable,” nor elected to treat the contract as void. No amount of talk or conversation, pleadings on the one part or harsh threats upon the other, could override this plain and necessary conclusion, nor could mental reservations, or beliefs that steps looking to a forfeiture had been taken, have any effect upon the situation as it then existed. Any exercise of an option to make all the instalments come due at once, or any election to treat the contract as void, must necessarily have been made after this time.
Now, the evidence shows that the next step taken by Mr. Dempsey was the writing of a letter on April 17, 1918, in which, among other things, the following language is used:
“I have extended to the West Side Sand & Supply Company every reasonable courtesy, and while I do not say that the payment, if made on April 25th, together with all interest in arrears, will not *153 be accepted, you must understand that I am not making any further extensions whatsoever.”
Plainly there is no election here either to declare the remaining instalments all due or to declare the contract void. The rights of the purchasers were again saved, assuming that Mr. Dempsey had a right to act for his company, and there is no intimation that he did not have such right. It may be said in passing that The Factory Site Company appears affirmatively by the testimony to have taken no corporate action in the matter whatsoever. It would appear that Mr. Dempsey acted upon his own initiative all the time up to some time in September, 1918, when he called in Mr. Squire and informed him of the situation, and it is by virtue only of the words and actions of Mr. Dempsey that his corporation can claim the benefit of a forfeiture, and it is thus upon these words and acts that it must here succeed or fail.
On April 25, 1918, Mr. Farver, who was one of the officers of The West Side Sand & Supply Company, wrote Mr. Dempsey the following letter:
“I wish to advise that I will be unable to make payment as promised on the West Side Sand & Supply Co. land contract today as expected.
“The money is to be raised through, the office of Guthery & Guthery and it will take more time than was anticipated at the time I wrote you.
“Mr. Lundwall and myself are having an uphill fight to put this matter through as there is a lack of harmony among those interested. However, we will accomplish it I am sure.
*154 “I cannot bring myself to ask further extensions from you, but I am going to say this that we have every reason to believe that we will have the payment with interest to offer you within the next ten days and hope that it will be acceptable to you at that time.
“Thanking you, I beg to be,
“Very truly yours,
“Chas. S. Farver.”
This letter was not answered, and in our opinion matters remained in statu quo; i. e., there was at this time no election and no forfeiture declared.
We think it is a general doctrine of equity, and held in a great number of cases, that the forfeiture provided for by a clause in a land contract, similar to the one here, will, on the failure of the purchaser to fulfill at the proper time, be disregarded and set aside by a court of equity unless such failure is intentional or results in loss to the vendor which can not be compensated by interest, and we think that this conclusion is in plain accordance with the general principle of equity in relation to relief against forfeitures. It is not, however, the universal rule; but the decisions upholding a contrary decision seem to us to ignore the equitable principle of relief from penalties and forfeitures. It may be stated as settled that where the parties have so stipulated as to make the time of payment of the essence of the contract, a court of equity can not relieve a vendee who has made default, but the difficulty in applying this rule is to determine when time has thus been made essential. We think it self-evident that time can not be re *155 garded as of the essence of a contract, so that a forfeiture shall ipso facto occur upon failure of the vendee to make a required payment, when the contract contains language to the effect that if any instalments shall not be paid when due then all instalments remaining unpaid shall at once become due and payable at the option of the vendor, and when the additional clause is inserted that in case of default it shall be lawful for the vendor, if it so elect, to treat the contract as void and re-enter upon the premises and retain the money paid as stipulated damages.
We think that under a contract like the one in the case at bar the happening of two things is essential to create a forfeiture: first, the exercise of an option to declare all unpaid instalments due, which of itself presupposes and necessitates the giving of a reasonable notice and an opportunity to make those payments; and, second, an election to treat the contract as void. Even if the first step was not a requisite, can the election to so treat the contract be read in Mr. Dempsey’s letter of April 17th? We think not. We have examined Mr. Dempsey’s testimony carefully and are unable to discover in it a recital of an intentional rescission of this contract. We of course can not be much impressed, or our judgment in any way affected, by any of the conversations he had with the vendee or its agents prior to the actual payment of the $2,000 in August, 1917, nor by Mr. Seymour’s letter, which was prior to that payment, which needs no other comment than the statement that after it was written this payment was accepted; *156 and, taking his view of the conversation with Mr. Williams as correct, we are unable to find in it an unequivocal repudiation or rescission of the contract, outside of his statement that the contract is “forfeited and is now a dead letter,” which statement appears to be only a statement of his conclusions regarding the situation. We find nothing therein which in and of itself creates a forfeiture. On the contrary we find him making suggestions as to how the situation might be cleared up. The following statement, for instance, is perfectly inconsistent with the idea that an unequivocal forfeiture was either declared or was in existence. Speaking of the fact that the contract was forfeited, he said:
“As far as that difficulty is concerned, I think of a way that might be arranged. The Factory Site Company owes, the Society for Savings some money, and it is among the possibilities that the Society might take a mortgage of $5,000, having it made directly to it, and credit that amount of money on the obligation of the Factory Site Company.
“ ‘Well,’ he, Williams, said, ‘Would you do that?’
“I said, ‘No, I wouldn’t say that I would.’ I said, T will not say what I will do.’ I said, ‘If you get around where you know what you can do, and will do, and there is somebody talking that can talk with authority, and it will go through, I will consider propositions that may be made.’ ”
That conversation was had some time in April or May of 1918. In the summer, Mr. Williams had another conversation with Mr. Dempsey,, when *157 Mr. Williams concededly told him that he was thinking of selling the property. The following ensued:
“ ‘Have you a purchaser in mind ?’ He said, ‘Yes/ and I said, ‘For what purpose?’ and he said, ‘A manufacturing purpose.’ I said, ‘Well, I would have no objection to that; that is what that land is for over there, as far as we are concerned, that is what we expect to sell it for — a good factory there would be satisfactory to me, but I would want some other conditions surrounding it. * * * Well, I will have to say to you, I will consider anything, because I will consider anything that a reasonable man brings to me, but I will not promise you a thing.’ ”
We thus reach the conclusion that The Factory Site Company, acting through its president, Mr. Dempsey, never took the proper steps to declare a forfeiture except in the very first instance where he had Mr. Seymour write a letter, but the effects of this letter were clearly obviated and the forfeiture waived by the acceptance of the next payment at a later date, and we find no similar action occurring later, and the necessary conclusion from the foregoing is that this contract had some validity at the time of the assignment to the plaintiff in this case, and that the plaintiff in this case is entitled to all the equitable rights of The West Side Sand & Supply Company.
Taking the case as a whole, we think it falls fairly within the spirit of the case of Rummington v. Kelley, 7 Ohio (part 2), 97, from which we quote the following at page 102:
*158 “In case there has not been on the one part a strict compliance, still if the conduct of the opposite party has been such as to evince acquiescence in the delay, such acquiescence will be construed favorably for the party apparently in default, and the opposite party can not be exonerated from performance. For instance, a vendee takes possession of the land purchased, and with the knowledge and assent of the vendor makes lasting and valuable improvements; in such case, a court of equity would be inclined to enforce a specific performance, although payment of the purchase money had not been punctually made. More especially would this be the case where improvements had been made without objection, after default of payment. So the receipt of a part or the whole of the purchase money, after the time of payment had elapsed, might be construed into a waiver on the part of a vendor, of any advantage he might have taken in consequence of the default of the vendee. And the same would be the case, should the vendor by any other conduct manifest that he did not intend to insist upon a strict and literal performance by the other party. And even where the purchase money is payable in installments, and there should be a failure in the punctual payment of one of these installments, I am not prepared to say that a vendor should be exonerated from performance, if, within a reasonable time, the vendee should make payment.”
A decree may be entered for the plaintiff, decreeing specific performance of this land contract, the defendant to exercise the option of whether it shall have the payment all in cash or in the manner of *159 deferred payments as provided for in the contract. Defendant to pay the costs.

Judgment for plaintiff.

Washburn and Vickery, JJ., concur.